**Tanay D. ANDERSON, Plaintiff,**

**Roger Vann Smith, Henry Veal, Jr., Gwendolyn Idell Sharoff, Michael Sharoff, Marcus A. Atkinson, an infant who sues by Kathleen Atkinson, his next friend, John W. Atkinson, Jr., Todd R. Bacote, Leroy S. Brown, Guillermina Cedano, Fajr Chestnut, Holly A. Crenshaw, Tamea A. Dunn, Charles A. Dunn, Jr., an infant who sues by Charles A. Dunn, Sr., his next friend, Charles A. Dunn, Sr., Richard Graves, Doryel Graves, Servah Griffin, George Hayes, Deitra Hines, an infant who sues by Gloria Forde, her next friend, Johnnie M. Jones, Ruby C. Jones, Ahmid Kanu, an infant who sues**

---

by Serwah Griffin, his next friend, Alhaji Kanu, an infant who sues by Serwah Griffin, his next friend, Christina Kanu, an infant who sues by Serwah Griffin, her next friend, Amos L. Persaved, Frances Reeves, Eric J. Schori, Aja Smith, an infant who sues by Catherine Smith, his next friend, Catherine Smith, Jan Smith, an infant who sues by Catherine Smith, her next friend, Mollie By. Smith, Eula M. Tyson, Sylvia Vick, Lauren Williams, Mary Witcher, Michelle D. Witcher, an infant who sues by Mary Witcher, her next friend, Angela Yankah, Sandra A. Yankah, an infant who sues by Angela Yankah, her next friend, Sarah A. Yankah, an infant who sues by Angela Yankah, her next friend, Stephanie A. Yankah, an infant who sues by Angela Yankah, her next friend, Ira Yearwood, Tracey L. Somers, Antoinette Archer, Jessie Harris, James Jacobson, Emma S. Manns, Mary V. McCormick, Kishla R. Moore, Dolores Scott, Ann E. Macleod, Pearline Coutman, Joseph S. Leak, Jr., June R. Sinclair, Catherine Gildea, Kimberly Bynum, Delores J. Holloway, Helen Richardson, Joann Chase, Cheryl Washington, Consolidated Plaintiffs,

v.

The NATIONAL RAILROAD PASSENGER CORPORATION, d/b/a Amtrak and CSX Transportation, Inc., Defendants.

Civ. A. No. 2:92CV1040.

United States District Court,
E.D. Virginia,
Norfolk Division.

Oct. 26, 1994.

Williard J. Moody, Stephen E. Heretick, Portsmouth, VA, for plaintiffs.

Robert Epstein, Robert Epstein and Associates, Norfolk, VA, for Helen Richardson.

William D. Breitt, Lori Marie Moore, Breit, Drescher & Breit, Norfolk, VA, for Cheryl Washington.

Williard J. Moody, Stephen E. Heretick, Joseph T. McFadden, Portsmouth, VA, for All Other Consolidated Plaintiffs.

Philip G. Denman, David C. Bowen, Stephen R. Jackson, Willcox & Savage, Norfolk, VA, Mark S. Landman, Thomas G. Merrill,

Stiff, Rosen, P.C., New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

The AMTRAK "Colonial" passenger train derailed on the evening of August 12, 1992 after Joseph Lee Bornman, Jr. and Raymond Gary Loomis used bolt cutters and their own strength to unlock, partially dismantle, and reverse an electronically, and physically, locked switch. This directed the Colonial onto a side track while the train was travelling at the speed of 79 miles per hour. The ensuing derailment was violent.

Plaintiffs, paying passengers on the Colonial, were among those injured in the wreck. AMTRAK owned and operated the train while CSX owned and maintained the track and switching equipment.

The complaint outlined four theories of liability: Count I alleged that the train was travelling at an unsafe speed; Count II charged that the track, switch, and signal were unsafe; Count III asserted that the passenger cars were unsafe; and Count IV advanced the theory that the CSX dispatch center in Jacksonville, Florida did not communicate adequately with the train. By Order dated February 22, 1994, the court granted the Defendants' motion for summary judgment on Counts I, III and IV, leaving only Count II for trial. As to it, the February 22 Order permitted Plaintiffs to proceed on two theories: "the failure ... to 'spike' the [milepost 19.6] switch and the alleged failure of the switch to function as designed." Because the evidentiary support for Count II was based solely on the affidavits of two expert witnesses whose assertions, if accepted, inarguably precluded summary judgment, the court directed that discovery should proceed, but granted leave for defendants to renew their motions as to Count II.

Upon completion of discovery the Defendants moved for summary judgment on the remaining Count. Plaintiffs have moved for reconsideration of their previously denied motion to vacate summary judgment respecting Count IV.[1] In an earlier opinion, the court held that because of applicable principles of common law and the terms of the operating agreement between AMTRAK and CSX, AMTRAK would be jointly liable for any breach by CSX of the duty of highest care owed by a common carrier in maintaining the switch and signal equipment. Thus, the issues presented by both motions implicate both Defendants. Moreover, the grounds upon which Plaintiffs seek reconsideration on Count IV are closely connected with the issues presented in the requested summary judgment on Count II. For these reasons, it is appropriate to reconsider the grant of summary judgment on Count IV, to assess Count IV as an integral part of Count II, and to assign to Defendants the burden of showing entitlement to summary judgment on both counts.

Having considered both motions on the basis of extensive briefs and the argument of counsel, the court grants Defendants' motion for summary judgment on Count II and affirms the previous grant of summary judgment on Count IV.

## STATEMENT OF FACTS

Around 8:00 o'clock on the night of August 12, 1992, Loomis and Bornman arrived at the milepost 19.6 switch in Newport News for the express purpose of derailing the Colonial for their amusement. Armed with a pair of bolt cutters, they began a thirty-minute process of preparing the switch eventually to be manually reversed less than a minute before the Colonial arrived, knowing that it would then be too late to stop the train from derailing. Loomis, apparently obsessed with, and somewhat knowledgeable about, trains, understood that this reversal would direct the train onto a side track designed for speeds much lower than the 79 miles per hour the

1. Plaintiffs previously moved for reconsideration of the grant of summary judgment on Count IV, but had no evidentiary support for their motion. However, they argued that discovery already taken suggested a reason for reconsideration which required additional discovery. The court permitted Plaintiffs to engage in further discovery and Plaintiffs now claim that they have acquired evidentiary and expert support as a result.

train likely would be travelling. The plan worked perfectly; the Colonial derailed; and these consolidated actions followed.

### A. Preparation Of The Switch At Milepost 19.6

Details concerning the vandals' preparation of the switch became very important in this litigation. The evidence, including the testimony of the two vandals, established the following largely undisputed facts respecting the events which gave rise to the Plaintiffs' injuries.

The switch that had to be thrown to divert the Colonial was electronically locked and also locked physically with a padlock. As the first step in their twisted and dangerous game, Loomis and Bornman cut the padlock and removed it from the switch. This process took fifteen to twenty minutes and required the strength of both men. Then, they encountered a snag—the foot pedal on the switch would not depress as Loomis had thought it would. The men quickly gathered that the cotter pin holding the foot pedal in place would also have to be cut. That process took five to ten more minutes. Having thusly freed the switch handle from its physically locked position, Loomis lifted it slightly to verify that it could be fully reversed at the right moment. Based on his observations of other railroads, however, Loomis understood that lifting the handle of the switch too far likely would breach the electronic locking system and thereby transmit a danger signal to the Oriana signal post, located approximately two miles west of where he and Bornman were working their mischief. Loomis, indeed, had calculated correctly that less than two minutes before the derailment would occur, the Colonial would pass a green light at the Oriana signal, the last signal post before the milepost 19.6 switch. Therefore, Loomis's objective was to lift the switch handle high enough to determine that it was free but not high enough to send a signal which would convert the green light at Oriana to red which, in turn, would activate a signal in the CSX Dispatcher Center in Jacksonville.

A few minutes after 9:00 p.m., the train rounded the gradual turn west of the switch at milepost 19.6. By then, the Colonial had passed the Oriana signal and was less than a mile away. Only then did Loomis and Bornman begin to reverse the switch. Several seconds later, the two men completed the reversal and ran for a safe perch from which to view the derailment.

### B. The CSX Dispatch Center

The dispatch center monitors and schedules the movement of trains on CSX tracks in a particular region using, among other things, eight screens that graphically display certain information about tracks and trains in a variety of locations within that region. A dispatcher with access to these screens also has a screen on his desk that can display a magnified version of any part of these graphics on which the dispatcher desires to focus particular attention. Finally, a dispatcher has communication equipment that allows him to contact the engineers of trains in his territory.

The CSX dispatch center in Jacksonville, Florida did not learn of the accident until approximately 25 minutes after it occurred. The dispatcher on duty the night of the derailment, David G. Kirkland, did not notice any abnormalities in the signals displayed on the monitoring screens before the derailment. In the usual course of his job, Mr. Kirkland's attention is not directed at all times to the screen which displays the Oriana signal, or to any other single screen for that matter. Nor was his attention thusly directed that night. In fact, there is evidence suggesting that Mr. Kirkland may have been preoccupied with personal matters and other duties for some considerable period of his shift, perhaps even including the time when the derailment occurred.

### C. Post–Accident Developments Respecting The Switch

The post-accident handling of the switch by the Defendants and third parties has emerged as a significant issue in the Plaintiffs' pleadings on both motions. The record on that issue, therefore, requires some discussion.

After the accident on August 12, the switch was sealed in the reverse position as Loomis

and Bornman had left it. The National Transportation Safety Board ("NTSB"), the Federal Railway Administration ("FRA"), and the FBI all arrived at the scene of the derailment late that night or early the next day. These federal investigative entities, and CSX, tested the switch. It is represented by CSX that those tests never revealed a problem with the switch. Nor do records of the federal investigations point to any such problems. After the tests were completed, the switch handle was removed and given to the FBI for evidentiary use.

Plaintiffs' counsel was retained some time around August 14 and immediately thereafter established with counsel for CSX a time to visit the scene to conduct testing. Because the area was temporarily inaccessible as a crime scene, counsel for both sides allegedly agreed that Plaintiffs should appear at 2:00 p.m. on August 20. Counsel for Defendants apparently did not communicate fully on the subject with CSX, and CSX soon undertook to remove the damaged track by using heaving equipment, including a bulldozer. Shortly before the time scheduled for inspection of the accident scene, counsel for Plaintiffs learned of that development. They then obtained a temporary restraining order in an *ex parte* proceeding in state court. The bulldozing was stopped until matters could be sorted out. When counsel arrived at the scene, they found that the switch had been removed and was lying away from the tracks. Counsel for Plaintiffs then requested that CSX remove the switch to the CSX yard. This was done, and the switch has been secure ever since.

## DISCUSSION

The briefs filed by both parties respecting the Defendants' Motion for Summary Judgment and Plaintiffs' Motion for Reconsideration of Their Motion to Partially Vacate Summary Judgment present several issues: (1) Did CSX have a duty to use extraordinary precautions, such as spiking or switch-point locking[2], at the milepost 19.6 switch? (2) Did the switch malfunction by not transmit-

ting a signal anywhere when the saboteurs removed the step-plate assembly? (3) Did the switch malfunction by not transmitting a signal anywhere when Loomis "tested" the switch by lifting the handle a few inches? (4) Finally, based upon information available to it after the switch was completely reversed, did CSX have any duty that, if performed, would have enabled the Colonial to avert derailment? Because the court assigns to Defendants the same burden, discussed below, on both the Defendants' summary judgment motion and the Plaintiffs' reconsideration motion, the issues will be discussed topically, rather than in connection with one motion or the other.

## A. The Standard For Summary Judgment And The Use Of Expert Opinion

Summary judgment is appropriate only when there is no issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A moving party is entitled to summary judgment if the nonmovant fails to provide sufficient support on an essential element of the case for which it has the burden of proof. *See Houchens v. American Home Assurance Co.,* 927 F.2d 163, 165 (4th Cir.1991) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). The evidence should be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Ross v. Communications Satellite Corp.,* 759 F.2d 355 (4th Cir. 1985). Moreover, summary judgment is not appropriate "even when there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom." *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979). Still, there is no genuine issue for trial where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

---

**2.** Both of these techniques lock the track in place so that it cannot be altered no matter what is done to the switch.

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and of establishing the lack of a genuine issue of material fact by pointing to relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any.' " *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. Then, the burden of production, but not persuasion, shifts to the non-movant. The nonmovant must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

■ Expert opinion constitutes much of the record that the court must consider in this case. Federal Rule of Evidence 702 governs the testimony of experts: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Thus, a court will not accept expert opinion merely because the witness purports to be an expert. First, the witness must have some "specialized knowledge," and the word "knowledge" in Rule 702 "connotes more than subjective belief or unsupported speculation." *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* — U.S. ——, ——, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993). Second, the expert's background must show qualification sufficient to permit expression of an opinion that is borne of the specialized knowledge or expertise which allows the expert to give opinion evidence in the first instance.

■ The court remains mindful, however, that, even with respect to expert witnesses, the credibility determination is for the jury, not the court. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *see also United States v. Carolina Transformer Co.,* 978 F.2d 832, 835 (4th Cir.1992). Nonetheless, a court should disregard expert opinion if it is mere speculation, not supported by facts. *See May v. Dover Elevator Co.,* 845 F.Supp. 377, 381 (E.D.Va.1994) (finding purely speculative an expert's theory that lacked physical evidence to support it but that was, according to the expert, "the only plausible explanation"); *Stokes v. L. Geismar, S.A.,* 815 F.Supp. 904, 909 (E.D.Va. 1993), *aff'd,* 16 F.3d 411 (4th Cir.1994) (holding that an expert's testimony as to causation was mere speculation where the expert himself admitted that his explanation of the cause was not the only reasonable one); *see also Rohrbough v. Wyeth Labs. Co.,* 719 F.Supp. 470, 474 (N.D.W.Va.1989), *aff'd,* 916 F.2d 970 (4th Cir.1990).

Guided by these standards, the court evaluates each material issue raised in both motions.

## B. The Alleged Duty To Use Spikes Or Switch–Point Locks

Plaintiffs argue that, in light of the history of vandalism in the area, Defendants had a duty to spike or switch-point lock the track at the milepost 19.6 switch and that their breach of this duty proximately caused the derailment. To support the existence of these duties, Plaintiffs attempt to establish an industry standard by relying on the testimony of Charles Penrod, his experience with switch spiking, and an entry in a publication entitled *Track Cyclopedia* respecting switch-point locking.

### 1. Switch–Point Locks

■ Through Mr. Penrod, Plaintiffs assert that certain entries in *Track Cyclopedia* establish a duty to use switch-point locks. Defendants argue that the *Cyclopedia* is a catalog or reference book for parts and equipment and that consequently it cannot be the source of an industry standard. The text of the *Cyclopedia* tends to support this description of the book, but it is not necessary to decide that issue because, even though the *Cyclopedia* refers to switch-point locks, it does not do so in the context of preventing vandalism or sabotage. That publication's short reference to switch-point locking merely notes that locks of this sort are useful in preventing unwanted rail movement that results from fast, heavy trains moving over the

track at the switch-point. That is a far different matter than whether a railroad ought to lock switch-points as a prophylactic to possible sabotage. Thus, even if the *Track Cyclopedia* is given weight as evidence of industry standards generally, it would not constitute evidence of the duty to lock switch-points under the circumstances presented by this case. There is no other evidence that switch-point locking is an accepted industry standard at all, much less that the procedure should have been employed at the switch here at issue.

2. Spiking The Switch

■ Plaintiffs also argue that, considering incidents of previous vandalism in this section of track and with respect to this switch, Defendants had a duty to spike the track at the switch location. For this, they rely on the testimony of Mr. Penrod who, in his deposition, cited five previous instances between 1977 and 1994 in which other railroads had used spiking specifically to protect against sabotage. For these examples even to be relevant under Federal Rule of Evidence 401, the imminence of harm and other circumstances surrounding the decision to use spikes must be significantly similar. *See* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 33, at 193 (5th ed. 1984) ("[E]vidence of the usual and customary conduct of others under similar circumstances is normally relevant and admissible, as an indication of what the community regards as proper, and a composite judgment as to the risks of the situation and the precautions required to meet them."); *cf. Cooper v. Firestone Tire and Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir.1991) (noting that the admissibility of prior accidents to prove negligence, design defect, or notice of defect, requires substantial similarity of circumstances).

The requisite similarity is not presented here, however. In three of the instances on which Mr. Penrod based his opinion, labor strikes presented an imminent threat to rail lines. The other two examples involved recurrent juvenile trespass and vandalism to train equipment. The railroads in those two instances safeguarded *manually-operated* switches. Moreover, in all five instances, the spikes were removed after some specific threat was eliminated.

Mr. Penrod's brush would paint a far broader duty than could be suggested by these isolated instances. The record does show a few acts of vandalism, but not sabotage, approximately 70 miles distant from milepost 19.6 and two events involving damage to the switch and nearby lights at milepost 19.6 in the seven months preceding the accident. But the events which gave rise to the derailment in August 1992 were not substantially similar to the events that Mr. Penrod suggests would trigger an industry practice obligating Defendants to spike the track at milepost 19.6. No specific threat of sabotage existed here as in the case of the labor strikes. The two acts of vandalism directed toward the switch and nearby lights inflicted damage to property, but evinced no effort to throw, or otherwise operate, the switch. The other acts of vandalism were far removed from the switch at milepost 19.6 and did not involve switches at all. None involved operation of a switch.

Moreover, under Mr. Penrod's theory, once an act of any vandalism has occurred, a duty to spike a switch could conceivably last forever, notwithstanding that he points to no instance where that course has been taken. Finally, even if Penrod's theory established that acts of vandalism might give rise to a duty to spike manually-operated switches, he offers no support for the extension of such a duty to spike track controlled by a switch that is both mechanically and electronically locked.

In any event, Mr. Penrod's reliance on isolated, relatively unique examples of spiking is akin to reliance by a plaintiff in a products liability action on a single example of a competing product "to make it a standard for the industry." *See Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 422 (4th Cir.1993). Such evidence, even if relevant, is as a matter of law insufficient to establish the duty here sought to be imposed on Defendants.[3]

---

3. Mr. Penrod's opinion, like that of the plaintiff's    expert in *Alevromagiros,* must be rejected as in-

This leaves only Mr. Penrod's naked opinion as the basis for the duty to spike. Recalling that an expert's opinion is not to be accepted merely because it is articulated, but must instead have a sufficient factual basis,[4] the court finds that Mr. Penrod's opinion standing alone is insufficient to impose the duty for which he argues. This is particularly true here because the Defendants are in a highly regulated industry with no shortage of written standards or established customs, none of which suggests the existence of the duty which Mr. Penrod espouses without factual support.

## C. The Allegedly Defective Switch And Signal Mechanism

Plaintiffs argue that the switch at milepost 19.6 did not perform as intended. Their principal evidence on the defective-switch theory is the opinion offered by Harvey Parker. Mr. Parker has opined that the conduct of Loomis and Bornman should have caused the switch to trigger a signal on three different occasions: (1) upon removal of the foot pedal; (2) upon testing (or lifting) the switch; and (3) upon complete reversal of the switch.

### 1. Removal Of The Foot Pedal And The Related Spoliation Of Evidence Theory

The record is clear that Mr. Parker simply speculates when he opines that removal of the foot pedal should have activated a signal. *See, e.g.,* Parker Dep., at 69–71 (admitting, among other things, that he had no basis for knowing whether the removal of the foot pedal created sufficient vibrations to activate a signal). In fact, Plaintiffs concede that "he can offer no factual bases to confirm his opinions." *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, at 11 n. 1. The heart of their argument on this issue lies in allegations that Defendants in-

tentionally altered or destroyed evidence. This, say the Plaintiffs, warrants application of the evidentiary spoliation doctrine which, in turn, precludes summary judgment.

The power of a court to permit a "spoliation inference," that evidence destroyed by a party would have been unfavorable to the position of that party, is relatively well-established. *See Schmid v. Milwaukee Electric Tool Corp.,* 13 F.3d 76, 78 (3rd Cir.1994); *EEOC v. American Nat'l Bank,* 652 F.2d 1176, 1195 (4th Cir.1981), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982). The inference stems from the "common sense observation that a party who has notice that [evidence] is relevant to litigation and who proceeds to destroy [evidence] is more likely to have been threatened by [that evidence] than a party in the same position who does not destroy the [evidence]." *Nation–Wide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 218 (1st Cir. 1982).

■ Given the rationale of, and the policy behind, the rule, its application necessarily must take into account the blameworthiness of the offending party and the prejudice suffered by the opposing party. *See Schmid,* 13 F.3d at 78–79; *Brown & Williamson Tobacco Corp. v. Jacobson,* 827 F.2d 1119, 1134 (7th Cir.1987), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988) (finding that the defendant's spoliation was strong evidence against it where one of the defendant's employees destroyed only the parts of certain documents that would have been relevant to the litigation). Of course, these decisions teach that some threshold level of blameworthiness is required before spoliation, if in fact shown to have occurred, becomes relevant. If accorded the construction most favorable to Plaintiffs here (while not subscribing to this as the proper standard),

---

adequate to establish the existence of the duty (to spike) that he advocates. In *Alevromagiros,* the Fourth Circuit rejected the testimony of an industrial engineer that the design of a particular ladder should have included triangular braces even though industry standards did not require them. Under that circumstance, the Court of Appeals determined that a reasonable juror could not have found that the ladder manufacturer breached any duty by not using the braces. *Id.*

at 421. Here, as in *Alevromagiros,* the extra precautions advocated by the Plaintiffs' expert might have prevented an accident, but, as in *Alevromagiros,* the proffered expert opinion alone is insufficient to establish a duty to have taken those extra precautions.

**4.** *See Daubert,* —— U.S. at ——, 113 S.Ct. at 2795; *May,* 845 F.Supp. at 381; *Stokes,* 815 F.Supp. at 909.

the cases require at a minimum that the party must have tampered with the evidence in some way while on notice that the evidence "might be necessary" to some party's claim. *See Nation–Wide Check*, 692 F.2d at 219. Also, as the First Circuit observed in *Nation–Wide Check*, a "district court has some discretion in determining how much weight to give the [spoliation], and prophylactic and punitive considerations may appropriately be taken into account." *Id.* And, the court must measure relevance in the crucible of Federal Rule of Evidence 403, for evidence of this sort has a very strong propensity to prejudice and confuse.

■ Guided by these principles, the court finds that a spoliation inference is not warranted on the facts presented here. The record shows that the NTSB, the FRA, and the FBI all had access to, and control over, the switch while performing their official investigative duties after the accident. The FBI actually took exclusive control of the handle of the switch. It was for this reason that Plaintiffs were unable to test the switch to determine how it functioned immediately after the sabotage, but this impossibility arose because of the actions of federal investigators (and, in part, because of the conduct of Loomis and Bornman). Hence, it may not be attributed to Defendants by virtue of a spoliation inference.

Defendants, however, are not entirely without blame as respects subsequent developments. If, as appears to be the case, counsel for Defendants did agree to afford Plaintiffs' counsel the opportunity to visit the site after it was no longer restricted as a crime scene, it was imprudent, if not improper, for Defendants to have removed the switch and to have begun bulldozing of the mangled track before the time Plaintiffs' counsel was scheduled to arrive. Still, given the testing done by federal entities and the need for Defendants to repair the damaged track and equipment, more than a permissi-

ble inferential step would be required to find that Defendants were blowing smoke away from some smoking gun. Also, it appears that there was some degree of miscommunication between CSX and its counsel, through whom the understanding with Plaintiffs' counsel had been reached. That is understandable given the circumstances surrounding their discussions. Further, as it now appears, the switch was simply moved so that bulldozing of the damaged track could take place. No doubt the switch was not properly secured in the interim before Plaintiffs' counsel arrived, but the record does not establish spoliation.

Moreover, Plaintiffs waited months before claiming spoliation even though the switch was available to them on several occasions during that time and even though they could have moved for access to it at any time if Defendants' counsel had refused access. Plaintiffs also could have tested other switches with the same circuitry. Considering Plaintiffs' theory that a properly functioning switch would have triggered a signal when handled as the saboteurs handled the milepost 19.6 switch, test results from other switches would have been probative.[5]

Plaintiffs' ability to test their theories did suffer to some extent because of the uncertainty as to whether the switch, as preserved, was in the same condition as at the time of the sabotage. The blame for that, however, rests in no small measure on parties other than Defendants. Thus, because Defendants are not seriously blameworthy, if at all, and because any prejudice to Plaintiffs is highly speculative,[6] the court would abuse its discretion by permitting a spoliation inference. There remaining no other basis to support the "removal of the foot-pedal theory," Defendants must prevail on it as a matter of law.

2. Testing the Switch

■ Defendants do not contest that, had Loomis lifted the handle more than a certain

---

5. The record shows that there are variations among individual switches so that testing another switch may not have been conclusive. Nonetheless, it might have produced probative results.

6. Plaintiffs adduced no evidence from Mr. Parker, or any other source, that testing of the

switch even after the alleged spoliation would not have been possible. In fact, Mr. Parker declined to test the switch when offered the opportunity during the litigation and gave only the most conclusory explanation for failing to do so.

distance (as to which there is disagreement), the switch should have triggered a signal to Oriana, which then should have caused: (i) that signal post to display the "stop" signal; and (ii) the track segment after Oriana to turn red on the dispatcher's screen in Jacksonville. Based on the engineer's testimony that the signal at Oriana was green (or "go") when he passed it and based on the computer records at the dispatch center in Jacksonville, the record establishes that this "stop" signal was not sent when Loomis tested the switch by lifting it a short distance. Plaintiffs are left, then, with the obligation to produce evidence of: (a) how high the handle was lifted; and (b) the distance that the handle of a properly functioning switch would have to be lifted in order to trigger a signal.

Only the two saboteurs provide clues on the first point. Loomis, who actually did the lifting and who understood that lifting the handle too far could cause a danger signal to be sent which would thwart his effort, testified in his deposition that he lifted the handle only one or two inches to avoid sending a signal while still ensuring that the handle was sufficiently free to allow complete reversal at the selected time. In deposition, Bornman gave a slightly different view, stating that Loomis had lifted the handle three, four, or perhaps six inches. Upon further questioning, Bornman stated that it was lifted three or four inches. Thus, upon a construction of the evidence, a reasonable jury could certainly conclude that Loomis lifted the handle one to four inches.

Defendants argue that, given Bornman's reasonably certain, and repeated, judgment that the switch handle had been lifted three to four inches and the equivocation he attached to his "six inch" estimate, a reasonable jury could not conclude that the handle had been lifted that high. It may be that the evidence on this issue is not sufficient to allow this case to go to the jury; however, the motions do not turn on that issue because Plaintiffs' theory falls short on the second point.

The only evidence on how the switches are supposed to function is that, although the minimum distances vary from switch to switch, the signal would be triggered if the handle were lifted from five to eight inches. Absent any evidence that maintaining a switch with an eight-inch tolerance would violate any duty, Plaintiffs cannot succeed in showing a defect merely by arguing that this switch should have triggered a signal if it was lifted six inches, the maximum figure even arguably supported by the record. Thus, even using Bornman's most generous, and somewhat conjectural, estimate that Loomis lifted the handle six inches, the evidence is not sufficient to permit a jury to conclude that the switch was defective in failing to trigger a signal.

There is no evidence that it is negligent to use a switch that will not trigger a signal if lifted between six and eight inches. Therefore, on this record, Mr. Parker's opinion that the switch malfunctioned is of no consequence because his opinion is based on the lifting distances supplied by Loomis and Bornman, which do not establish a lift distance sufficient to activate a normal switch calibrated between six and eight inches. Thus, Mr. Parker's opinion does not permit Plaintiffs to avoid summary judgment on the testing theory. Indeed, on this record, Mr. Parker's opinion respecting the saboteurs' test of the switch is nothing more than speculation, and speculation by an expert is not sufficient to avoid summary judgment.

### 3. Complete Reversal Of The Switch

Plaintiffs' most factually intricate theory posits that: (1) the reversal of the switch as the train approached the switch at milepost 19.6 should have signalled the dispatcher in Jacksonville, Florida; (2) the dispatcher had a duty to react very quickly to that signal to tell the engineer on the Colonial that there was trouble on the track at milepost 19.6; and (3) the exercise of this duty would have enabled the Colonial to slow sufficiently to avoid derailment. The record reveals numerous impediments to the successful assertion of this theory.

#### a. The Relevant Signal

The first difficulty with this theory concerns the nature of any signal that should have been transmitted. In that regard, the

undisputed facts show that the status of the signal post at Oriana is not relevant to this issue because, when a train enters the segment of track that follows Oriana, the signal there automatically changes to indicate "stop" to other trains. The same signal would also appear at Oriana if the milepost 19.6 switch were reversed. Thus, because the signal would already indicate "stop" once the Colonial entered the segment of track controlled by the Oriana signal, reversal of the switch at milepost 19.6 would then have no effect on the Oriana signal. The Oriana signal post is also irrelevant because, as everyone agrees, the engineer on the front of the train was already beyond the Oriana signal when Loomis and Bornman reversed the switch. Accordingly, any change of that signal would not have been seen by the Colonial's engineer.

The relevant signal, therefore, is the one that is transmitted to the CSX dispatch center in Jacksonville. Signals received there are displayed on large television screens. Those screens are followed, after a fashion, by dispatchers. A dispatcher has visual access to eight screens in the Jacksonville center. The dispatcher can view the status of many segments of track on each screen. A segment of track is essentially the track between two signal posts.

When a train enters the segment of track past the Oriana signal, the segment turns red on the screen that displays that segment of track, among many others on the system. The screen, then, shows that the Oriana signal is displaying a "stop" signal to any trains that would follow. Just as a switch reversal is not reflected at the Oriana signal post when a train is in the segment of track beyond that position, it is likewise not reflected in Jacksonville on the graphical display of that same track segment. That track segment is already displayed in red; and, therefore, a switch reversal in that segment changes nothing.

A separate indication for an abnormal switch status does appear, however, even when a train is occupying the same segment of track that the switch affects. That indication is a blinking white signal which appears on the same screen that displays the corresponding segment of track.

Plaintiffs' experts on this issue, Wallace F. Holl and William C. Pugh, contend that Mr. Kirkland, the dispatcher whose screens reflected this segment of track, and others, had a duty constantly to monitor all eight screens assigned to him and that he should have seen the abnormal signal generated immediately when Loomis and Bornman reversed the switch at milepost 19.6. Mr. Pugh, a former Chief of the Railroad Division for the NTSB, opined that the CSX dispatcher "had the duty to maintain constant watch over ... the switch at or near milepost 19.6," and that the dispatcher "had the equipment and experience necessary" to know of the danger "within seconds." Pugh Affidavit, ¶ 10. Mr. Holl, a former Regional Director of the FRA, expressed the view that a dispatcher's "most essential job responsibility" is "to maintain constant attention to the changing status displays" and to react to them. Holl Affidavit, ¶ 12.

### b. The Qualifications Of The Expert Witnesses

The testimony of Messrs. Holl and Pugh respecting the role of CSX's dispatch system, the duties of dispatchers, and the failure of the dispatcher to satisfy those obligations is insufficient to create a jury issue because neither witness is qualified by training, knowledge, or experience as an expert in the field of dispatching. Both, of course, are eminently qualified in a number of railroad related areas, but their qualifications reflect a notable, and fatally defective, absence of experience, training, or base of knowledge on the role and operation of railroad dispatch systems. Hence, they fail to satisfy the threshold requirement of expertise under Federal Rule of Evidence 702. In like fashion, their opinions on the dispatch system and the conduct of the dispatcher are inadmissible because they do not represent the product of specialized knowledge. The result, of course, is that their opinions do not stand in the way of summary judgment.

### c. The Opinions Of The Expert Witnesses

Even if the opinion of Messrs. Holl and Pugh could qualify for admission under the

threshold requirements of FRE 702, their testimony would not preclude summary judgment because their opinions lack factual support. For example, in basing a duty on CSX policy, Messrs. Holl and Pugh both rely principally on CSX regulations, including Train Dispatcher's Regulation 532: "Train dispatchers must take prompt action to provide protection against any known condition that could affect [safety]. Defects in ... track signals and related equipment ... and other unusual occurrences must be recorded and reported promptly to the chief train dispatcher." Holl Affidavit, ¶ 8; Pugh Affidavit, ¶ 4. From this, both conclude, without asserting that Mr. Kirkland was the "chief train dispatcher" or that the abnormal switch was a "known condition," that Mr. Kirkland immediately should have seen an abnormal status indication, contacted the Colonial, and alerted the engineer to apply brakes. Mr. Pugh and Mr. Holl both ignore the undisputed CSX policy that requires the dispatcher to communicate with the chief dispatcher before communicating with the engineer. The undisputed record is that Mr. Kirkland was not the chief dispatcher. This, of course, is fatal to the opinions they express based on the policy of CSX.

Moreover, neither Mr. Holl nor Mr. Pugh takes account of the time required for both communications to occur. That timing is critical in this action because the Plaintiffs' theory has but a few seconds to spare. The evidence respecting the location of the Colonial when the saboteurs began to throw the switch is nebulous. The estimation of the culprits themselves places the train only one-quarter to one-half of a mile from the switch. Plaintiffs' counsel in oral argument, however, explained how other facts from Loomis's and Bornman's testimony suggest the train was further away than that, perhaps as far away as a mile from the switch. At 79 miles per hour, a train (or any other object) travels one mile in about 46 seconds. Thus, an expert opinion inculpating a dispatcher in Jacksonville for not preventing this accident would need much more detail than the Plaintiffs have provided.

The record demonstrates that the following events would have had to take place before the train could have been stopped: (1) an abnormal switch indication would have to appear on the dispatcher's screen; (2) the dispatcher would have to observe that indication and, pursuant to CSX policy, contact the chief train dispatcher; (3) the chief train dispatcher would have to establish contact with the engineer of the Colonial; and (4) the engineer would have to fully apply the brakes. The train would be almost on top of the switch, if not already derailed, by the time these events occurred.

Neither Mr. Poll nor Mr. Pugh explained the time required for these events. Hence, their opinion that the accident could have been averted if Mr. Kirkland had complied with CSX regulations is mere speculation. Given the undisputed testimony of the engineer that, upon braking, the train would travel approximately one-half of a mile before stopping, and extending to Plaintiffs all benefit of the doubt respecting the location of the train when the switch was reversed, the record establishes that even the most attentive dispatcher could not have prevented the derailment. Thus, to the extent that Plaintiffs base their theory solely on Mr. Kirkland's divergence from CSX policy, they have failed to provide sufficient evidence that his divergence from it, if any, was a proximate cause of the derailment.

The Plaintiffs' theory is defective for the additional reason that neither expert offered anything more than his conclusory opinion about exactly how a dispatcher can perform all of his duties and still notice within seconds every indication appearing on any of the eight screens assigned to him. Nor does either witness define what is a reasonable length of time within which the dispatcher should have seen a signal change once it has occurred. This factor might determine the outcome here because Plaintiffs allege that an unsafe condition arose not in a segment of track ahead of the train, but in the very segment of track that the Colonial was occupying, and that the dispatcher should have reacted to that condition quickly enough to have prevented an accident. For example, if one minute were a reasonable delay, there could be no dispute but that any breach of

the dispatcher's duty was not a cause of the accident.

Plaintiffs' experts also ignore the lack of evidence that the dispatcher should have known, or would have had any way of knowing, where the Colonial was positioned relative to the switch when the abnormal indication appeared (assuming that such an indication did appear). Obviously, the dispatcher could have known that the train was in that same segment, but the record contains no evidence that the dispatcher could, or should, have known more than that.

The Plaintiffs' experts then aver (only in the most general way) that satisfaction of the duty, as they have explained it, would have prevented the accident. Their opinions, however, do not take into account the delay between switch reversal and receipt of an abnormal switch indication in the Jacksonville dispatch center. That is crucial in this case because it is uncontroverted that this delay would have been between 1.7 and 90 seconds, depending on the amount of traffic on the communication lines. Therefore, on the undisputed record, the train could have derailed long before the alleged abnormal signal appeared, if it appeared, on the dispatcher's screen in Jacksonville. Specifically, if the switch were reversed forty seconds before the train arrived there and the signal took fifty seconds to reach Jacksonville, it would undeniably be too late for the dispatcher to take preventive action.

The duty that Plaintiffs would impose on the dispatcher does not stop simply with requiring him to have seen the abnormal switch indicator immediately after the switch was thrown. Plaintiffs' experts further opine that, because CSX policy required the dispatcher, after seeing this indicator, to take "prompt" action to prevent the derailment, the dispatcher should have reacted immediately to tell the engineer of the existence of the abnormal signal. Neither Mr. Holl nor Mr. Pugh, however, lend any precision to their opinion. They do not explain, for example, how the dispatcher could have communicated with the train and how long this reasonably would have taken.

d. The Role Of The CSX Dispatch Center

Plaintiffs' theory, being fundamentally inconsistent with the evidence respecting the actual operation of the CSX Dispatch Center, necessarily attacks the whole concept of dispatching and the role of the dispatch center that is established by CSX policies and operation. Such an all-out attack is certainly one avenue that is conceptually available to Plaintiffs, but it must be recognized as conceptually distinct from the contention that divergence from a party's own policy is some evidence that it breached a duty.

In this case, though, the all-out attack is a dead end. No facts suggest the CSX dispatch center was, or should have been, more like an air traffic control tower, able to avert disasters that occur in a matter of seconds. According to the record, the signal system in the field is intended to, and does, serve those purposes. Although Plaintiffs' experts do not really say so, their opinions seem to be based on the unstated premise that the CSX Dispatch Center played a role more like an air traffic control system. While CSX's dispatch center in Jacksonville may have been state-of-the-art in its train routing capability, the record here does not establish that it was, or should have been, designed to fulfill the safety function now sought to be ascribed to it by Messrs. Holl and Pugh.

## CONCLUSION

This disaster would not have occurred were it not for the saboteurs' knowledge that they needed to wait for the train to pass the Oriana signal before reversing the switch. Colonial passengers were doomed when the train passed the "go" signal at Oriana. Plaintiffs suffered a tragic event and were injured, some quite seriously, but not at the hands of AMTRAK or CSX. The motion for summary judgment on Count II is granted; the previous grant of summary judgment is affirmed for the additional reasons herein set forth; and the action is dismissed with prejudice.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record.

It is so ORDERED.