**RAMBUS, INC., Plaintiff,**

v.

**INFINEON TECHNOLOGIES AG, et al., Defendants.**

**No. CIV.A. 3:00cv524.**

United States District Court, E.D. Virginia, Richmond Division.

May 18, 2004.

See also 220 F.R.D. 264.

Michael W. Smith, Craig T. Merritt, Esquire, R. Braxton Hill, Christian & Barton, L.L.P., Richmond, VA, Gregory P. Stone, Peter A. Detre, Munger, Tolles & Olson LLP, Los Angeles, CA, for Plaintiff.

Brian C. Riopelle, Robert M. Tyler, McGuire Woods, LLP, Richmond, VA, John M. Desmarais, Gregory S. Arovas, Michael P. Stadnick, Kirkland & Ellis, New York, NY, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

This matter is before the Court on the motion of the Defendants, Infineon Technologies AG, Infineon Technologies North America Corporation and Infineon Technologies Holding North America, Inc. (hereinafter collectively "Infineon") to compel production of documents being withheld from production by the Plaintiff Rambus, Inc. ("Rambus") under claims of attorney-client and work product privilege. Specifically, this is a continued consideration of Infineon's Motion to Compel Production of Documents and Testimony Relating to Rambus' Document Retention, Collection and Production (Docket No. 492) which, to some extent, was addressed by the Amended Memorandum Opinion issued herein on March 17, 2004. *Rambus, Inc. v. Infineon Tech. AG,* 220 F.R.D. 264 (E.D.Va. 2004) (hereinafter the "March 17 Opinion").

Since the March 17 Opinion was issued, the Court has conducted an *in camera* review of approximately 4,600 privileged documents. Also, as directed by the March 17 Opinion, Rambus has produced numerous additional documents, as to which assertions of privilege were rejected in the March 17 Opinion, and additional depositions have been taken. Additional briefing has been received and additional argument has been heard. And, Rambus has advised that it intends to seek interlocutory appellate review of this decision. To take account of the results of the *in camera* document review, to consider the information in newly produced documents as to which privilege assertions were rejected, to reflect the additional briefing and argument, to avoid excessive cross-referencing to the March 17 Opinion, and to facilitate appellate review, this Memorandum Opinion will resolve completely Infineon's motion to compel addressed to the issue of spoliation of evidence.[1]

## STATEMENT OF FACTS

Rambus develops and licenses technologies to companies that manufacture semiconductor memory devices. Rambus does not itself manufacture any such devices; rather, it relies on licensing its technology patents to generate revenue. In 1990, Rambus filed United States Patent Application Serial Number 07/510,898 with claims directed to a computer memory technology known as Dynamic Random Access Memory. The United States Patent and Trademark Office ("PTO") determined that this application covered several independent inventions and thus issued an eleven-way restriction requirement requiring Rambus to elect one invention to pursue in its application. In response, Rambus filed numerous divisional and continuation applications based on its original application, at least thirty-one of which have issued. These patents are directed to Dynamic Random Access Memory technology ("DRAMs"),

Rambus DRAMs ("RDRAMs"), Synchronous Dynamic Random Access Memory ("SDRAM"), and Double Data Rate Synchronous Dynamic Random Access Memory ("DDR–SDRAM").[2]

## A. General Background of the Litigation

On August 8, 2000, Rambus brought this action against Infineon, alleging infringement of several DRAM-technology related patents. *Rambus, Inc. v. Infineon Tech. AG,* 145 F.Supp.2d 721, 722 (E.D.Va.2001). In response, Infineon raised numerous affirmative defenses and asserted several counterclaims, some of which related to Rambus' interaction with the Joint Electronics Devices Engineering Council ("JEDEC"), an industry standard-setting body in which Rambus was a member from December 1991 to June 1996. *See Rambus, Inc. v. Infineon Tech. AG,* 318 F.3d 1081, 1084–86 (Fed.Cir.2003), *cert. denied,* — U.S. —, 124 S.Ct. 227, 157 L.Ed.2d 135 (2003).

Before trial, an opinion was issued construing the disputed claim terms of the patents-in-suit. Thereafter, but before trial, Rambus abandoned the charge of infringement as to one of the patents-in-suit. After the presentation of Rambus' infringement case on the remaining patents, judgment as a matter of law ("JMOL") was granted in Infineon's favor, thereby making it unnecessary for Infineon to proceed on several of its affirmative defenses and counterclaims.

However, Infineon's counterclaim for fraud was tried to a jury which found Rambus liable on Infineon's counterclaim for actual and constructive fraud. This Court, however, granted Rambus' post-trial motion for JMOL as to the constructive fraud claim and as to that part of the actual fraud verdict that related to the DDR–SDRAM standard setting process of JEDEC. *Rambus, Inc. v. Infineon Tech. AG,* 164 F.Supp.2d 743, 767 (E.D.Va.2001). Rambus' motion for JMOL

---

**1.** Several of the topics addressed in the March 17 Opinion are not discussed herein because Rambus has produced the documents ordered to be produced in Section I.B and Section I.C of the March 17 Opinion and has submitted the revised privilege log as required by Section I.A of that Opinion.

**2.** These technologies are described in some detail at *Rambus, Inc. v. Infineon Tech. AG,* 164 F.Supp.2d 743, 747–48 (E.D.Va.2001).

as to the SDRAM standard was denied and judgment was entered on that verdict.

On appeal, the United States Court of Appeals for the Federal Circuit affirmed in part and reversed in part. *Rambus, Inc.,* 318 F.3d at 1106. In particular, the Federal Circuit held that this Court's claim construction was erroneous as to five claim terms. Respecting the actual fraud verdict, the majority opinion held that the JEDEC patent disclosure policy applied only to patent claims that reasonably read on or covered the standard under consideration by JEDEC and that, although Rambus wanted to obtain claims covering SDRAM standards, it did not in fact obtain any SDRAM patent claims while it was a JEDEC member. *Rambus, Inc.,* 318 F.3d at 1103–04. In reaching that conclusion, the Federal Circuit stated that:

> The record shows that Rambus's claimed technology did not fall within the JEDEC disclosure duty. The record shows at most that Rambus wanted to obtain claims covering the SDRAM instead. Some of that evidence does not put Rambus in the best light. Rambus thought it could cover the SDRAM standard and tried to do so while a member of an open standards-setting committee. While such actions impeach Rambus's business ethics, the record does not contain substantial evidence that Rambus breached its duty under the EIA/JEDEC policy.

*Id.* at 1104. The Federal Circuit thus remanded the case to this Court. *Id.* at 1107.

It is useful to understand the issues to be tried on remand. To begin, there will be a trial on Rambus' claims that Infineon has infringed Claim 26 of United States Patent No. 5,954,804, Claims 1 and 2 of United States Patent No. 5,953,263, and Claim 18 of United States Patent No. 6,034,918.[3] With but two exceptions, all of Infineon's affirma-

tive defenses will be tried.[4] Thus, the trial on remand will involve the defenses of noninfringement, patent misuse, estoppel, laches, laches in the PTO, unclean hands, invalidity due to indefiniteness, and inequitable conduct in the procurement of the patents-in-suit.[5] Some of these affirmative defenses will be supported, in part, with evidence about Rambus' conduct while it was a member of JEDEC, but none depend entirely on such evidence.

With the exception of Counts 1, 2, 4, and 12, none of Infineon's original counterclaims remain in the case. 1/8/04 Tr., at 67–101. Counts 1, 2, and 4 seek declaratory judgments of noninfringement, invalidity, and unenforceability of the '263, the '804, and the '918 patents, respectively. Count 12 alleges monopolization in violation of the Sherman Act, 15 U.S.C. § 2, because Rambus allegedly has acquired monopoly power in the market for DRAM technology and the market for the DRAMs themselves. According to Count 12, Rambus allegedly acquired the monopoly power by a number of means, including intentionally not citing prior art, misleading the PTO to secure patents on DRAM technology, manipulating JEDEC, acquiring information from JEDEC to achieve these results, asserting and litigating unlawfully obtained patents against the entire DRAM industry, and engaging in other predatory, anticompetitive, and exclusionary conduct.[6]

Recently, the Court granted Infineon's motion to amend to add another counterclaim, Count 15, which alleges that Rambus has violated California's unfair competition statute, Cal. Bus. & Prof.Code § 17200. *See Rambus, Inc. v. Infineon Tech. AG,* 304 F.Supp.2d 812 (E.D.Va.2004). Count 15 incorporates by reference much of the alleged misconduct that is the predicate for Count 12, the monopolization claim.[7] But, the un-

---

**3.** *See* Transcript of Hearing, January 8, 2004, at 39–59 (hereinafter "1/8/04 Tr."); *see also* Order, April 1, 2004.

**4.** Infineon will not proceed with the following affirmative defenses: unenforceability due to waiver and implied license.

**5.** Rambus has moved for summary judgment as to several of these defenses, as well as for summary adjudication of infringement. These mo-

tions are currently pending the completion of briefing and argument.

**6.** Rambus has also moved for summary judgment as to Count 12; that motion also is pending.

**7.** Some, but certainly not all, of the incorporated allegations are of little, if any, efficacy by virtue of the decision of the Federal Circuit on Infineon's fraud counterclaims.

fair competition counterclaim goes beyond the allegations of the monopolization count. Considered as a whole, Count 15 alleges that Rambus' monopolistic scheme, its manipulative and bad faith participation in the JEDEC-standard setting process, its spoliation of documents as a key ingredient for planned patent litigation, and its deliberate misconduct in DRAM-related litigation is actionable as unfair competition under the California statute.[8]

## B. General Background of the Motions to Compel

Shortly before the close of discovery in the initial proceedings, the Court granted in part Infineon's motion to compel Rambus to produce documents and testimony under the so-called "crime/fraud exception" to the attorney-client privilege. *Rambus, Inc. v. Infineon Tech. AG*, 155 F.Supp.2d 668, 680 (E.D.Va.2001); *see generally Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir.1999) (discussing "crime/fraud exception" to attorney-client privilege). In particular, by Order entered on March 7, 2001 (the "March 7 Order"), the Court concluded that Infineon had made out a prima facie showing that Rambus had devised and implemented a fraudulent scheme, that Rambus had communicated with counsel in furtherance of the scheme, and that these communications bore a close relationship to the fraudulent scheme. The Court, therefore, ordered Rambus to disclose documents respecting the legal advice provided to Rambus pertaining to its disclosure of patents and patent applications to JEDEC, the JEDEC patent disclosure policy, efforts by Rambus to broaden its patents to cover matters pertaining to JEDEC standards, and the preparation of Rambus' June 17, 1996 withdrawal letter from JEDEC.

Rambus sought appellate review of the March 7 Order by filing a Petition for a Writ of Mandamus in the Federal Circuit. The appellate court denied the petition. Rambus, however, did not seek review of the March 7 Order on its direct appeal at the end of the initial proceedings in this Court.

Following remand from the Federal Circuit,[9] a status conference was convened on October 31, 2003 for the purpose of planning for the trial. In that conference, Infineon represented that, in proceedings involving Micron Technologies, Inc. ("Micron"), Hynix Semiconductor, Inc. ("Hynix"), and the Federal Trade Commission ("FTC"),[10] Rambus had produced a substantial quantity of documents that should have been produced in this action, but were not. Rambus acknowledged that some of the documents produced in those proceedings should have been produced in this action, but asserted that others should not have been. Infineon urged that Rambus' failure to produce those documents was more litigation misconduct of the kind Rambus already had been found to have committed[11] and, therefore, Infineon sought an order requiring immediate production of the documents. In response, Rambus urged that the reason for non-production lay in the difference between the document requests in this case and those in the other cases.

To ascertain the facts relevant to resolution of what could have been a significant failure to produce documents in the initial stage of this case, the Court entered an Order on November 5, 2003 (the "November 5 Order") which required the parties:

> to review all requests for production of documents previously served herein by the other party and any rulings made by the Court thereon and, not later than Decem-

**8.** Rambus has moved for dismissal of Count 15 in its entirety under Fed.R.Civ.P. 12(b)(6) and alternatively, for summary judgment on part of Count 15. That motion has been briefed and argued and is currently under consideration.

**9.** The matter was stayed while the Supreme Court of the United States considered Infineon's Petition for a Writ of Certiorari. The high court denied Infineon's Petition on October 6, 2003. *Infineon Tech. AG v. Rambus, Inc.,* —— U.S. ——, 124 S.Ct. 227, 157 L.Ed.2d 135 (2003) (mem.).

**10.** Those parallel litigations involve some of the patents-in-suit here and many of the same issues that are presented in this action.

**11.** *See Rambus, Inc. v. Infineon Tech. AG,* 155 F.Supp.2d 668, 680–83 (E.D.Va.2001). The finding of litigation misconduct was undisturbed on appeal to the Federal Circuit.

ber 1, 2003, to produce [to the other side] copies of all documents (as to which no attorney-client privilege is claimed) production of which had been previously requested but which had not been previously produced.

The November 5 Order also ordered the parties to serve "a list of documents as to which attorney-client privilege is claimed for such previously requested, but not produced, documents," and to serve a "memorandum in support of any privilege claimed." During a conference call respecting the November 5 Order, the Court instructed the parties that the privilege list and memorandum must be "very fulsome" and sufficiently specific to allow the adversary to file a meaningful motion to compel. The November 5 Order also established a briefing schedule, ordering that any motions to compel production of any allegedly privileged documents be filed by January 5, 2004.

In response to the November 5 Order, Rambus produced to Infineon approximately thirty boxes of previously requested, but not previously produced, documents. Then, on December 15, 2003, Rambus served what purported to be the privilege list required by the November 5 Order, listing over 4,000 allegedly privileged documents—2,000 more documents than Rambus claimed as privileged in the original proceedings in this Court.[12] Along with that list, Rambus filed a three-page memorandum explaining in the most general terms the basis for the privileges asserted. A review of the privilege list disclosed that Rambus had withheld from production on claims of privilege an unascertainable quantity of documents that admittedly fell within the reach of the March 7 Order that had been produced previously to Micron, Hynix, and the FTC, but that had not been produced to Infineon. Rambus also refused to produce twenty-seven documents

that admittedly fell within the scope of the March 7 Order that had never been produced to anyone, assertedly because of their belated discovery.[13] That history spawned two discovery motions from Infineon.

First, there was Infineon's Motion to Compel Production of Documents Listed on Rambus' Privilege Log. See Docket No. 490. That motion was resolved in Sections I.A. through C. of the March 17 Opinion wherein Rambus was ordered to produce a revised privilege log, to produce the documents previously produced to Micron, Hynix, and the FTC, as well as the twenty-seven belatedly discovered, supposedly privileged, documents. Rambus, Inc., 220 F.R.D. at 290–91. None of those issues remain under consideration now because Rambus supplied a revised privilege log as required by Section I.A. of the March 17 Opinion and produced the documents ordered to be produced in Sections I.B. and C. of the March 17 Opinion.

The second Infineon motion is the matter that currently is under consideration, Infineon's Motion to Compel Production of Documents and Testimony Relating to Rambus' Document Retention, Collection, and Production. See Docket No. 492. By this motion, Infineon seeks an order requiring Rambus to produce documents that describe and relate to the development and implementation of Rambus' document retention program, which, says Infineon, Rambus used to destroy documents pertinent to the issues in this action, notwithstanding that, at the time of the document destruction, Rambus anticipated litigation with DRAM manufacturers over Rambus' portfolio of patents. In other words, Infineon has accused Rambus of spoliation of evidence and, therefore, asserts that application of the so-called "crime/fraud" exception to the attorney-client and work product privileges compels the disclosure of these documents.[14]

---

12. Subsequent revisions produced a privilege log dated February 12, 2004; that log claimed 4,673 documents as privileged.

13. Rambus has not disclosed when those twenty-seven documents were discovered or why it was so late in locating them.

14. In addition, Infineon argues that Rambus has waived any claim of privilege as to any docu-

ments discussing the subject matter of the document retention program, including why it was adopted and how it was implemented, because Rambus, for its own purposes: (1) has disclosed, in this and other cases (through depositions and document discovery), the substantive contours and components of its document retention policy; and (2) has testified about the asserted reasons for the policy's implementation and how it

### C. The Nature of the Documents Sought by Infineon's Motion Respecting Spoliation and the Background of the Motion

#### (1) The Nature of the Documents Sought

In the motion now under consideration, Infineon moves to compel the production of documents and testimony that relate to Rambus' document retention, document collection, and production of documents. Specifically, Infineon seeks an order compelling Rambus to produce:

(1) Six documents on Rambus' privilege log [15] and all other documents that relate to document retention;

(2) Other documents relating to Rambus' document retention policy or document destruction including transcripts from depositions or trials, as well as pleadings that relate to the topic of Rambus' document retention policy and document destruction;

(3) Documents relating to the collection and production of documents in this case and any other case involving SDRAM.

The motion also asks for a date certain on which to depose Rambus' witnesses and attorneys on the topic of Rambus' document retention, collection, and destruction.

#### (2) The Background of this Motion to Compel

This motion has its genesis in the original pretrial proceedings when, shortly before the 2001 trial, the discovery process disclosed some troublesome conduct on the part of Rambus. Specifically, Rambus was found to have committed various acts of litigation misconduct, including the intentional destruction of documents relevant to this action. *Rambus, Inc. v. Infineon Tech. AG*, 155 F.Supp.2d 668, 680–83 (E.D.Va.2001). Rambus did not appeal the findings of litigation misconduct, including the finding that it had intentionally destroyed relevant documents in anticipation of litigation. Thus, the deci-

sion of the United States Court of Appeals for the Federal Circuit in *Rambus, Inc. v. Infineon Tech. AG*, 318 F.3d 1081 (Fed.Cir. 2003), left undisturbed those findings notwithstanding that it vacated the award of attorneys fees because of the determinations regarding Infineon's fraud counterclaims and the construction of the claim terms.

After the trial in 2001, and while the matter was on appeal to the Federal Circuit, Rambus continued to be involved in the previously described other litigations respecting technologies and patents for DRAM, SDRAM, RDRAMs and DDR–SDRAMs. As explained above, Rambus produced, in those parallel actions—which involved some of the technologies and patents involved here—approximately thirty boxes of documents that had been requested by Infineon in this action but that Rambus had not produced to Infineon here. As recounted above, those documents have now been given to Infineon in this litigation.

As a result of (i) some of these late produced documents, (ii) the text of the supplemental privilege log discussed at length in the March 17 Opinion, and (iii) information secured in the parallel litigations involving Rambus, Infineon ascertained that the document destruction in which Rambus had engaged before trial was much more extensive than had been disclosed in the discovery that took place immediately before the original trial of this action. In fact, during the parallel proceedings between Rambus and the FTC (held after the trial in this case), it came to light that, on September 3, 1998 ("Shred Day"), Rambus had destroyed over 20,000 pounds of documents (estimated to be approximately two million pages). *Rambus, Inc.*, 220 F.R.D. at 284. There is also evidence that the document destruction continued, at least, into 1999 and 2000. In fact, Infineon recently reported that, from documents produced pursuant to the March 17 Order, it has learned that Rambus conducted

---

was implemented. That second topic, subject matter waiver, is addressed in a separate Memorandum Opinion.

**15.** Document Nos. 313, 326, 327, 1114, 2784, and 4077.

Shred Days in 1999 and 2000.[16]

Infineon seeks production of documents and testimony respecting the circumstances surrounding, and the consequences of, this extensive destruction of documents. Rambus, for its part, contends that the document destruction in which it admittedly engaged was pursuant to a legitimate document retention program that was not implemented in anticipation of litigation and that its destruction of documents was for legitimate reasons.

## DISCUSSION

### I. Spoliation and the Piercing of Rambus' Privileges

#### A. The Applicable Legal Principles [17]

█ Infineon contends that, because Rambus implemented a document destruction program to destroy documents in anticipation of patent litigation with DRAM manufacturers, including Infineon, the crime/fraud exception to the attorney client and work product privileges applies to strip Rambus of asserted privileges with respect to the adoption, the implementation, and the consequences of the document destruction policy.

█ The crime/fraud exception to the attorney-client and work product privileges provides that otherwise privileged communications or work product made for, or in furtherance of, the purpose of committing a crime or fraud will not be privileged or protected. *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir.1999); *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir.1994); *see generally Developments in the Law— Privileged Communications*, 98 Harv. L.Rev.

1450, 1509–14 (1985). As noted by the United States Court of Appeals for the Second Circuit:

> Whereas confidentiality of communications and work product facilitates the rendering of sound legal advice, advice in furtherance of a fraudulent or *unlawful goal* cannot be considered "sound." Rather advice in furtherance of such goals is socially perverse, and the client's communications seeking such advice are not worthy of protection.

*In re Grand Jury Subpoena*, 731. F.2d 1032, 1038 (2nd Cir.1984) (emphasis added). Thus, although referred to as an "exception" to the attorney-client privilege and work product doctrine, the crime/fraud exception is not truly an exception.[18] Rather, it is an exclusion of certain activity from the protective reach of the privileges. *In re Grand Jury Subpoena*, 731 F.2d at 1038. As one noted commentator has put it, the crime/fraud "exception" merely delineates the outer contours of the attorney-client and work product privileges, recognizing the commonsense notion that these privileges "cannot avail to protect the client in concerting with the attorney a crime or other evil enterprise." 8 John Wigmore, *Evidence* § 2298 at 572 (McNaughton rev.1961); *see also In re St. Johnsbury Trucking Co.*, 184 B.R. 446, 456 (Bankr.D.Vt. 1995) ("[T]he exception is not really an exception, but an exclusion.").[19]

█ Infineon argues that, because the sought-after documents pertain to spoliation of evidence, the crime/fraud exception applies. Spoliation is "the willful destruction of evidence or the failure to preserve potential evidence for another's use in pending or future litigation." *Trigon Ins. Co. v. United*

---

16. *See* Def. Ex. 5 to Def. Memo. Regarding Rambus' Waiver of Attorney–Client and Work Product Privileges on the Subject of Rambus' Pre-Trial Doc. Destruction, April 6, 2004.

17. Spoliation of evidence is governed by the law of the regional circuit, not by the decisions of the Federal Circuit, because spoliation is a matter not peculiar to patent law the redress of which is procedural. *Wang Labs., Inc. v. Applied Computer Sci., Inc.*, 958 F.2d 355, 357 (Fed.Cir.1992); *Silicon Image, Inc. v. Genesis Microchip, Inc.*, 271 F.Supp.2d 840, 849 (E.D.Va.2003). And, the federal law of spoliation applies rather than the law of any state. *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir.2001).

18. Indeed, in order to establish the applicability of the attorney-client privilege, the proponent must show, *inter alia*, that the communication was not made "for the purpose of committing a crime or tort." *Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir.1998).

19. These observations are correct: the crime/fraud exception is not really an exception to the attorney-client privilege or work product doctrine, but instead is an exclusion of certain activity from the protection of the privileges. However, because most authorities use the term "crime/fraud *exception*," it will be used here too.

*States,* 204 F.R.D. 277, 284 (E.D.Va.2001); *see also Hodge v. Wal–Mart Stores, Inc.,* 360 F.3d 446, 450 (4th Cir.2004); *Anderson v. Nat'l R.R. Passenger Corp.,* 866 F.Supp. 937, 945 (E.D.Va.1994). In order to establish spoliation, the movant must show (1) that the adverse party had a duty to preserve evidence and (2) that it nevertheless intentionally destroyed the evidence. *Trigon Ins. Co.,* 204 F.R.D. at 284. The duty to preserve evidence "arises not only during litigation but also extends to the period before the litigation when a party reasonably should know that the evidence may be relevant to *anticipated litigation."* *Silvestri v. General Motors Corp.,* 271 F.3d 583, 591 (4th Cir.2001) (emphasis added). Therefore, once a party reasonably anticipates litigation, it has a duty to suspend, as to documents that may be relevant to the anticipated litigation, any routine document purging system that might be in effect; failure to do so constitutes spoliation. *Id.; see also Lewy v. Remington Arms Co., Inc.,* 836 F.2d 1104, 1112 (8th Cir.1988); *Thompson v. United States Dep't of Hous. & Urban Dev.,* 219 F.R.D. 93, 101 (D.Md.2003).

Thusly defined, however, spoliation is neither a crime nor a fraud. Although the United States Court of Appeals for the Fourth Circuit occasionally refers to the crime/fraud exception as the crime/fraud/*tort* exception,[20] spoliation, although raising issues of duty and breach, does not quite qualify as a tort either. *Cf. Silvestri,* 271 F.3d at 590 (stating that spoliation does not give rise to independent substantive claim). *But see* Terry R. Spencer, *Do Not Fold, Spindle, or Mutilate: The Trend Towards Recognition of Spoliation as a Separate Tort,* 30 Idaho L.Rev. 37 (1993). At first blush, therefore, it would not appear that documents created to provide a plan for or to effectuate spoliation would fall under the crime/fraud exception.

The term "crime/fraud exception," however, is "a bit of a misnomer," *Blanchard v. EdgeMark Fin. Corp.,* 192 F.R.D. 233, 241 (N.D.Ill.2000), as many courts have applied the exception to situations falling well outside of the definitions of crime or fraud. *E.g., Parrott v. Wilson,* 707 F.2d 1262, 1271 (11th Cir.1983) (stating that crime/fraud exception applies to work product created as result of lawyer's "unprofessional conduct"); *Cleveland Hair Clinic, Inc. v. Puig,* 968 F.Supp. 1227, 1241 (N.D.Ill.1996) (holding crime/fraud exception applicable to communications made in furtherance of "bad faith litigation conduct"). Although the United States Court of Appeals for the Fourth Circuit has not set forth a precise test for application of the crime/fraud exception in cases of spoliation, it is inconceivable that our Court of Appeals would find that a client's interest in confidential communications and work product respecting destruction of documents in anticipation of litigation would outweigh the societal need to assure the integrity of the process by which litigation is conducted which, of course, is the purpose of prohibiting spoliation of evidence.[21] *Silvestri,* 271 F.3d at 590 ("The policy underlying [the spoliation doctrine] is the need to preserve the integrity of the judicial process in order to retain [society's] confidence that the process works to uncover the truth."). Indeed, the "[d]estruction of evidence undermines two important goals of the judicial system—truth and fairness." Lawrence B. Solum & Stephen J. Marzen, *Truth & Uncertainty: Legal Control of the Destruction of Evidence,* 36 Emory L.J. 1085, 1138 (1987). As those authors correctly state:

> Evidence destruction impedes the search for truth because it creates inaccuracy if the fact of destruction is unknown and uncertainty if the fact of destruction is revealed. Destruction of evidence is unfair because it potentially creates inequality of access to information.

*Id.* at 1138.

Moreover, other courts, when confronted with a variety of untoward conduct, have

---

**20.** *E.g., Chaudhry,* 174 F.3d at 403; *In re Grand Jury Subpoenas,* 902 F.2d 244, 245 (4th Cir. 1990).

**21.** District courts within the Fourth Circuit have applied the crime/fraud exception in varying circumstances. *See, e.g., United States v. Ruhbayan,* 201 F.Supp.2d 682, 686 (E.D.Va.2002) (applying crime/fraud exception upon prima facie showing

of obstruction of justice); *Parkway Gallery Furniture, Inc. v. Kittinger/Pa. House Group, Inc.,* 116 F.R.D. 46, 53 (M.D.N.C.1987) (discussing crime/fraud exception in context of violations of antitrust law); *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1172 (D.S.C.1975) (assuming applicability of crime/fraud exception to violations of antitrust law).

concluded that the exception is not confined to circumstances of crime or fraud. For instance, the United States Court of Appeals for the District of Columbia Circuit teaches that the crime/fraud exception applies when the work or communication was made for, or in furtherance of a crime, fraud, *"or other type of misconduct fundamentally inconsistent with the basic premises of the adversary system." In re Sealed Case,* 676 F.2d 793, 812 (D.C.Cir.1982) (emphasis added). And, that circuit has applied the crime/fraud exception, so defined, to communications and work product created in furtherance of spoliation. *In re Sealed Case,* 754 F.2d 395, 400 (D.C.Cir.1985).[22] After examining the decisional law of the United States Court of Appeals for the Second Circuit, the court, in *In re St. Johnsbury Trucking Co.,* 184 B.R. 446, 456 (Bankr.D.Vt.1995), held that the crime/fraud exception should apply to communications or work product created "in furtherance of some *sufficiently malignant purpose,"* a definition that would include cases of spoliation of evidence. Similarly, after examining the decisional law of the United States Court of Appeals for the Fifth Circuit, a district court in Florida held—in the context of the attorney-client privilege—that the crime/fraud exception applies "not only where fraud or crime is involved, but also where there are other *substantial abuses of the attorney-client relationship." International Tel. & Tel. Corp. v. United Tel. Co. of Fla.,* 60 F.R.D. 177, 180 (M.D.Fla.1973) (emphasis added); *see also Sound Video Unlimited, Inc. v. Video Shack, Inc.,* 661 F.Supp. 1482, 1486 (N.D.Ill.1987) ("The attorney-client privilege does not apply when the person consults an attorney to further a continuing or future crime, fraud *or other misconduct."*) (emphasis added).

More importantly, construing the crime/fraud exception to encompass spoliation is fully consonant with the Fourth Circuit's instructions on how to apply the underlying privileges.[23] In the Fourth Circuit, the at-torney-client and work product privileges are to be "strictly confined within the narrowest possible limits consistent with the logic of [their] principle[s]." *In re Grand Jury Proceedings,* 727 F.2d 1352, 1355 (4th Cir.1984) (internal citations and quotations omitted). Courts recognize the attorney-client privilege because "full and frank" discussions between lawyer and client "encourages observance of the law and aids in the administration of justice." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *see also Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The work product doctrine recognizes that lawyers, as officers of the court bound both to "work for the advancement of justice" and the "rightful interests" of their clients, must be able to produce material without fearing its wide dissemination. *Hickman v. Taylor,* 329 U.S. 495, 510, 67 S.Ct. 385, 91 L.Ed. 451 (1947). To provide zealous representation of clients in our adversarial system of justice, lawyers must be free to assemble information, sift the relevant from the irrelevant facts, prepare legal theories, and plan litigation strategy without the undue interference of having their thoughts and opinions broadcast widely. *Hickman,* 329 U.S. at 511, 67 S.Ct. 385. The work product doctrine, therefore, recognizes that the widespread distribution of attorneys' work product would have a "demoralizing" effect on the profession that would not benefit individual clients or the system as a whole. *Id.*

Communications between lawyer and client respecting spoliation of evidence, however, is fundamentally inconsistent with the asserted principles behind the recognition of the attorney-client privilege, namely, "observance of law" and the "administration of justice." *Weintraub,* 471 U.S. at 348, 105 S.Ct. 1986. Indeed, by intentionally removing relevant evidence from litigation, spoliation directly undermines the administration of justice. *Cf. Craig v. A.H. Robins Co., Inc.,* 790 F.2d

---

**22.** The spoliation at issue in *In re Sealed Case* included the "willful, systematic and extensive" destruction of documents that had been subpoenaed. 754 F.2d at 400.

**23.** As stated in footnote 19, *supra,* in defining the crime/fraud exception, the decisions actually are delineating the substantive scope of the attorney-client privilege and work product doctrine. *See also In re St. Johnsbury Trucking Co.,* 184 B.R. at 456.

1, 3–4 (1st Cir.1986) (allowing introduction of evidence that would otherwise have been protected by attorney-client privilege because communications pertained to intentional destruction of evidence, a subject contrary to administration of justice). Moreover, an attorney who counsels a client about the spoliation of evidence is not advancing the observance of the law, but rather counseling misconduct. Thus, there is no logical reason to extend the protection of the attorney-client privilege to communications undertaken in order to further spoliation. *Cf. Madanes v. Madanes,* 199 F.R.D. 135, 149 (S.D.N.Y.2001) ("At a minimum, then, the attorney-client privilege does not protect communications ... that undermine[ ] the adversary system itself.").

Similarly, attorney work product materials that relate to the spoliation of evidence neither "work for the advancement of justice" nor further the *"rightful* interests" of an attorney's client. *Hickman,* 329 U.S. at 510, 67 S.Ct. 385 (emphasis added). Declining to afford such materials protection would not have a "demoralizing" effect on the profession nor would it fail to accord attorneys, as officers of courts, their rightful sphere of protection. *Id.* at 511, 67 S.Ct. 385. To the contrary, by removing the ability of lawyers and clients to hide such materials behind the work product privilege, the courts will assure that the work of lawyers is confined to the rightful interests of clients, rather than interests—such as the destruction of evidence—that frustrate the administration of justice and cast the legal system (as well as the legal profession) in an unsavory light.

■ For the foregoing reasons, the crime/fraud exception extends to materials or communications created in planning, or in furtherance of, spoliation of evidence. That conclusion, however, does not resolve the issue whether the crime/fraud exception applies to the documents that are the object of Infineon's motion. In order to pierce Rambus' claims of privilege in this case, Infineon must make a prima facie showing: (1) that Rambus was spoliating, or was planning to spoliate, evidence and sought or used the advice of counsel or the input of work product to further that endeavor; and (2) that the

documents containing the communications or work product bear a close relationship to Rambus' scheme to engage in spoliation. *Chaudhry,* 174 F.3d at 403.

## B. The Evidence of Spoliation as of the March 17 Opinion

It is settled that Rambus instituted a document destruction policy and thereby intentionally destroyed documents. *Rambus, Inc. v. Infineon Tech. AG,* 155 F.Supp.2d 668, 680–83 (E.D.Va.2001). It is also settled that the destroyed documents covered all of the major categories of documents generated in the ordinary course of Rambus' business. Through depositions, Infineon has established that Rambus' document purging program resulted in the destruction of evidence relevant to this action, including evidence related to: the prosecution of the patents-in-suit, Rambus' participation in JEDEC, Rambus' prosecution of JEDEC-related patents, the relationship of Rambus' patent applications and pending claims to JEDEC standards, presentations to Rambus' Board of Directors regarding intellectual property, potentially damaging or invalidating prior art, and Rambus' SDRAM licensing negotiations. Thus, it is established that Rambus intentionally destroyed evidence and that at least some of this evidence was relevant to this action.

Furthermore, it is also settled that some destruction occurred at a point in time when Rambus anticipated litigation and therefore had a duty to preserve the evidence. *Rambus, Inc.,* 155 F.Supp.2d at 682. That finding was made on the basis of a somewhat more limited record respecting the scope and effect of the destruction. But, the finding was not made in the context of an effort to pierce the attorney-client and work product privileges, but rather in the context of the awarding of attorneys fees. *Id.* Hence, although the finding is final and is of considerable probative value, it is appropriate to assess the issue whether the attorney-client and work product privileges should be pierced by using the earlier finding as probative, but not dispositive, of that issue in the context of document spoliation.

On the basis of what was known as of the March 17 Opinion, Infineon had shown that Rambus formulated and instituted a document retention and destruction policy in early 1998. Beginning in March of that year, Joel Karp ("Karp"), a non-lawyer who serves as Rambus' Vice President of Intellectual Property, drafted a document retention policy based on information supplied by a law firm, Cooley Godward, LLP ("Cooley Godward"). In fact, entry number 313 on Rambus' updated privilege log reflects Karp's work on a document retention policy, indicating a March 19, 1998 letter sent by Cooley Godward to Karp entitled: "Memorandum regarding legal advice on Document Retention Policy Guidance." Of course, because Rambus has claimed the attorney-client privilege as to this document, Infineon was not able to ascertain its precise contents. That privilege log entry establishes, however, that Rambus, with the aid of counsel, was formulating some kind of document retention system in early 1998.

As of the March 17 Opinion, it also had been shown that, in the summer of 1998, Karp and outside counsel gave presentations on the document retention policy, presenting several slide shows to employees to inform about the system. Then, Karp kicked-off the document retention program on September 3, 1998 with "Shred Day,"[24] an event at which each employee at Rambus' corporate headquarters in Mountain View, California was provided with a burlap bag with the instructions to bag all documents slated for the shredder. Infineon, of course, described Shred Day in a rather sinister fashion, pointing to internal Rambus emails that reflect that Shred Day culminated in a 5:00 PM beer, pizza, and champagne "celebration." Rambus, in contrast, framed this beer, pizza, and champagne treat not as a "celebration," but rather as corporate incentive and morale boosting after a day of heavy sack lifting and laborious document review. Whatever Rambus' motivations may have been, it was uncontested as of the March 17 Opinion that, all told, Rambus employees shredded approximately 20,000 pounds of documents on Shred Day—some 2 million pages of documents. In

addition, it was known that on several additional days in the fall of 1998, the shredder trucks returned to Rambus, resulting in the destruction of additional documents.

As of the March 17 Opinion, it was also known that Lester Vincent ("Vincent"), Rambus' former outside patent prosecution counsel who drafted many of the Rambus claims had, pursuant to instructions from Rambus, destroyed some documents just before Rambus instituted this litigation in 2000 but before Rambus sent a letter to Infineon accusing it of infringement. *Rambus, Inc.,* 155 F.Supp.2d at 682. And, it was known that, thereafter, Rambus instructed its other outside counsel to follow suit.

Furthermore, the privilege log that Rambus filed pursuant to the November 5 Order showed that, in February 1998, as Karp was developing the document retention program, Karp was also sending and receiving communications that are now claimed as privileged because, according to the privilege log, they allegedly are "legal strategy in anticipation of litigation" and "strategic patent litigation." Also, about three weeks after Shred Day, Neil Steinberg ("Steinberg"), an attorney, sent Karp a memorandum entitled "preliminary infringement study." Infineon argued that, although it could not tell precisely what the documents discuss because of the privilege claims, the entries on the privilege log showed, at least, that Rambus was anticipating patent litigation during the time period that it formulated and instituted its document purging system.

Infineon also pointed to depositions of various Rambus employees and executives. For instance, Allen Roberts, Rambus' Vice President of Engineering, testified under oath that Karp directed him to purge his files at least in part because "such materials are discoverable in subsequent litigations." Roberts Depo., April 14, 2001, at 339. Furthermore, Tony Diepenbrock ("Diepenbrock"), a lawyer in Rambus' in-house legal department, testified that one of the understood reasons behind Shred Day was that "some of

24. Infineon did not coin the term "Shred Day"; rather, the term appears in multiple in-house Rambus emails that Rambus has disclosed in discovery.

that stuff is discoverable." Diepenbrock Depo., April 11, 2001, at 207.

Also by the March 17 Opinion, it was known that the FTC proceedings had resulted in conclusions pertinent to the spoliation issue. Specifically, in the FTC proceedings, the administrative law judge denied the FTC's request for summary judgment based on Rambus' destruction of evidence, but imposed sanctions (in the form of adverse inferences and rebuttable presumptions) because of Rambus' document destruction. In so doing, the administrative law judge held:

> Here, all credible evidence indicates that Rambus knew or should have known that it could reasonably anticipate litigation concerning patent infringement from the proposed JEDEC standards for [D]RAM.... Certainly by the time Rambus chose to commence its document retention programs in 1998, it knew or reasonably could anticipate [D]RAM-related litigation.

Order on Complaint Counsel's Motions for Default Judgment & Oral Argument, Feb. 26, 2003, at 6. This finding, of course, also supports the contentions that Infineon presses here.

Moreover, Rambus' privilege log illustrated that Rambus was developing both a patent litigation strategy and its document retention program *at the same time*. For instance, privilege log entries 319 and 320, which reflect memorandum written in early 1998 from Rambus' in-house legal department to Karp, establish that Rambus was developing "strategy" in "anticipation of litigation," at the very same time that it was developing its document purging system. Thus, as of the March 17 Opinion, it was known that Rambus clearly anticipated some type of litigation at the point it destroyed documents, and that, at the time, the company was taking legal advice on document destruction.

And, as of the March 17 Opinion, Infineon had learned of an internal document created by Rambus' intellectual property team in June 1999 that discusses the company's intellectual property goals for 1999. *Rambus, Inc.*, 220 F.R.D. at 287. The document was among the thirty boxes produced by Rambus

pursuant to the November 5 Order. Under a heading entitled "Infringing Devices," Rambus' intellectual property goals included:

- Initiate reverse engineering of infringing devices as required for litigation prep.

*Id.* Under the heading "Licensing/Litigation Readiness," the company's goals, *inter alia*, were:

- Prepare licensing positions against 3 manufacturers
- Prepare litigation strategy against 1 of the 3 manufacturers (re: 3D)
- Ready for litigation with 30 days notice
- Organize 1999 shredding party at Rambus

*Id.* Thus, by the March 17 Opinion, Infineon had presented evidence that, taken together, rather strongly indicated that Rambus had explicitly linked development of its document retention policy and the shredding of documents with the company's preparations for patent litigation.

As of the March 17 Opinion, however, it was not entirely clear that the assertedly privileged documents bore a close relationship to Rambus' spoliation scheme. *Chaudhry*, 174 F.3d at 403. Nonetheless, by March 17, Infineon had presented evidence sufficient to support a reasonable belief that a review of the at-issue documents themselves might yield evidence to establish the applicability of the crime/fraud exception. *United States v. Zolin*, 491 U.S. 554, 574–75, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). Moreover, when reviewing the first ten volumes (of forty-eight volumes) of privileged documents *in camera* as part of the effort to ascertain the adequacy of Rambus' privilege log, the Court noticed several documents that supported Infineon's position and bolstered the showing that it had made on the basis of what was known on March 17. Thus, the Court undertook an *in camera* review. 220 F.R.D. at 287.

### C. The Results of the *In Camera* Review

The privilege log filed by Rambus in this phase of the litigation reflected 4,673 documents claimed as privileged. Each of those

documents was reviewed by the undersigned.[25] The *in camera* review was of all of those documents because, when reviewing *in camera* the first ten volumes to ascertain the adequacy of the privilege log filed pursuant to the November 5 Order, it became obvious that the privilege log misdescribed a number of documents and inadequately described others. Further, that review of those ten volumes disclosed a number of documents that supported Infineon's contention that the document destruction in which Rambus had engaged was part of its patent licensing and litigation strategy.

In the early to mid–1990's, Rambus' most significant patent licensing relationship was with Intel Corporation. Evidence presented in several motions and in arguments in the initial pretrial proceedings herein indicated that, in 1998, the relationship with Intel Corporation was beginning to unravel and that Rambus was of the view that computer manufacturers were using its technology without a license to do so.

The *in camera* review confirmed what was established, in less detail, by the non-privileged evidence.[26] First, the review showed that, by early 1998, Rambus took legal advice respecting a patent licensing and litigation strategy. The *in camera* review disclosed a number of documents, as to which privilege claims were made, that explicitly refer to Rambus' document retention program, and most of those reflect that the program was a component of the company's patent licensing and litigation strategy.[27] Many of those documents also show that, as of early 1998, Rambus anticipated that it soon would initiate patent litigation against specific DRAM manufacturers, including Infineon. Most of

those documents are dated in 1998. A few are dated in 1999 and 2000.

Also, the *in camera* review disclosed a number of documents as to which privilege claims were made, that, although not specifically mentioning the document review program, show that, in late 1998 and throughout 1999 into 2000, Rambus anticipated initiating patent litigation with specifically identified DRAM manufacturers, including Infineon. Those documents are dated in 1998, 1999, and 2000, at which time, according to non-privileged evidence (documents and depositions), Rambus was engaged in document destruction. Those documents also reflect that, at the same time it was engaged in document destruction in late 1998, in 1999 and in 2000, Rambus was continuing to pursue the same patent licensing and litigation strategy that was formulated in early 1998 which included the document retention program as a constituent element.[28]

The documents reviewed *in camera* confirm in great detail what the non-privileged evidence strongly indicated: that, in 1998, 1999, and 2000, Rambus intentionally destroyed a great volume of documents, many of which were of the type that would likely be relevant in the patent litigation that Rambus was planning from early 1998 until commencement in mid to late 2000.[29] The *in camera* review confirmed that, as some of the non-privileged evidence indicated, the destroyed documents were likely discoverable and relevant to issues in this action.

### D. Information in Briefs Filed After the March 17 Opinion

The information known as of the March 17 Opinion has been augmented by information

**25.** The Court considered appointing a Special Master to conduct the review of these documents. However, after taking into account the lengthy history of this litigation and its complex nature, as well as the Court's familiarity with the record, the terms and names that appeared in many of the documents that were trial exhibits, and the past history of the issue respecting spoliation, the Court concluded that the process of review would take considerably longer if undertaken by someone unfamiliar with the case. Thus, it was concluded that the interests of efficiency and economy, from the standpoint of the judicial system and the parties, would be best served if the Court conducted the review itself.

**26.** All references to "Doc. No. ___" refer to the numbers assigned to the documents listed in Rambus' Revised Privilege Log dated February 12, 2004.

**27.** Listed numerically, they are: Doc. Nos. 313, 315, 317, 319, 325, 326, 327, 371, 373, 374, 375, 376, 528, 1114, 1960, 2784, and 4077.

**28.** Listed numerically, such documents are: Doc. Nos. 268, 270, 271, 279, 358, 363, 364, 367, 644, and 2331.

**29.** This action was filed on August 8, 2000.

presented in the supplemental briefing received since March 17. It will be recounted now.

As indicated previously, the March 17 Opinion required Rambus to produce a number of documents claimed to be privileged; Rambus has done so. Thereafter, depositions were conducted, and there have been supplemental briefs filed on the topic of subject matter waiver. Infineon's brief on that issue has disclosed additional facts that pertain to the issue of spoliation.

For example, it now has been established that Rambus continued to implement its document destruction program through 1999 and that the company conducted a second "Shred Day" on August 29, 1999. That was accomplished as part of the company's "IP Q3'99 Goals." A document by that title was recently produced. It followed the same format as previously discussed quarterly intellectual property goal documents. Under heading "3. Licensing/Litigation Readiness," three of the listed goals for the third quarter of 1999 were:

E. Prepare litigation strategy against 1 of three manufacturers (re: 3D)

F. Ready for litigation with 30 days notice

G. Organize 1999 shredding party at Rambus

Infineon's Memo. Regarding Rambus' Waiver of the Attorney–Client & Work Product Privileges on the Subject Matter of Rambus' Pre–Trial Doc. Destruction, April 6, 2004, Ex. 4 (hereinafter "Infineon's April 6 Brief"). Also, it now has been shown, through a recent deposition, that, in December 2000, Rambus conducted another such activity, purportedly in connection with an office move. That, of course, was while pretrial discovery was underway before the 2001 trial of this action. Infineon's April 6 Brief, Ex. 6, at 131.

Furthermore, pursuant to a request made by the Court during an April 27, 2004 hearing, Infineon submitted a recently disclosed Rambus document that further confirms that Rambus was indeed planning litigation with DRAM manufacturers prior to its first Shred Day. That document, styled as "SSD Q499 GOALS—Rev 3," contains the subheading "POSITION RAMBUS FOR THE FUTURE INCLUDING IP." And, under that subheading, the document recounts: "Get all infringers to license our IP with royalties < RDRAM (if it is a broad license) OR sue." During a recent deposition, Rambus' former President, David Mooring, testified concerning that document: "I think it's a set of goals or potential goals for 1998 that was probably written in early 1998." Mooring Depo., April 13, 2004, at 96.

The foregoing is the current status of the record against which Infineon's spoliation motion is to be assessed.

### E. Rambus' Position on Spoliation

Rambus correctly notes that today virtually all companies have document retention policies. *See generally* Christopher Cotton, *Document Retention Programs for Electronic Records: Applying a Reasonableness Standard to the Electronic Era*, 24 J. Corp. L. 417 (1999); John M. Fedders & Lauryn H. Guttenplan, *Document Retention & Destruction: Practical, Legal, & Ethical Considerations*, 56 Notre Dame L.Rev. 5 (1980); Devin Murphy, *The Discovery of Electronic Data in Litigation: What Practitioners & Their Clients Need to Know*, 27 Wm. Mitchell L.Rev. 1825 (2001). Rambus contends that its document retention policy is fairly typical, is in accordance with the general standards applicable to such programs, and was adopted for legitimate business reasons, not in anticipation of litigation.

In support of these contentions, Rambus quotes from a slide presentation that Karp gave to Rambus employees immediately before Shred Day. These slides instruct employees that, *inter alia,* documents designated as containing trade secret information should be retained for the life of the trade secret, that personnel records should be kept for a period of three years, and that employees should "LOOK FOR THINGS TO KEEP" and to "LOOK FOR REASONS TO KEEP IT." 220 F.R.D. at 285.

In addition, although Rambus does not dispute the fact that it destroyed documents because of their "discoverability," it suggests that Infineon has misunderstood the true

nature of Rambus' concerns. Rambus argues that, in the late 1990s, Karp and other Rambus executives became concerned that Rambus was keeping far too many documents and back-up tapes and that, if Rambus was ever asked to produce documents in discovery or as the result of a third-party subpoena, it would require vast resources to sift through the materials.[30] For instance, Karp testified under oath that:

> "[M]y concern was that if I was ever asked to produce these thousands of back-up tapes, regardless of what they concerned— they did not just contain e-mail, they contained everything—that it would be a task that would be beyond the human endurance to try to figure out what was on those things."

*Rambus, Inc.*, 220 F.R.D. at 286 (quoting Karp's deposition testimony). In addition, Richard Barth ("Barth"), a former Rambus employee who testified at deposition regarding the document retention policy and Shred Day, stated:

> "I don't recall [Karp] being so much worried about documents that were harmful to Rambus in that it would reveal you know, some dastardly secret. What I do remember is that, yeah, we are pack rats and the amount of stuff that we had was enormous. And the concern was that if we had to go and grind through all that and produce it, it would just kill us. We'd get no engineering done. All our resources would be consumed by plowing through old stuff."

*Id.* (quoting Barth's deposition testimony). *Compare with Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 481 (S.D.Fla.1984) ("The stated purpose of the [document retention program] was the elimination of documents that might be detrimental to Piper in a lawsuit."). Thus, although Rambus admits that it instituted its document retention policy out of discovery-related concerns, it contends that these concerns were related to the legitimate purpose of reducing search and review costs, not for the purpose of eliminating potentially-damaging documents that a future adversary might discover.

The position of Rambus is significantly undermined by the fact that Rambus has not shown that it was exposed to litigation other than the patent litigation which it was itself formulating in 1998, 1999, and 2000. Nor did the *in camera* document review reveal that Rambus considered itself threatened by litigation instituted by others. And, considering Rambus' assessment that its intellectual property was not respected by others, it is unlikely that the need to defend litigation brought by others was on the company's mind at the time. Indeed, the only litigation mentioned in Rambus' documents is that which it intended to bring.

In sum, although Rambus has presented evidence that, in concept, it structured its document retention program like a lawful program and that some of its articulated reasons for adopting the policy were conceptually valid, these arguments ignore the rather convincing evidence that Rambus intentionally destroyed potentially relevant documents notwithstanding that, when it did so, it anticipated litigation. In any event, even if Rambus had been instituting a valid purging program, it disregarded the principle that even valid purging programs need to be put on hold so as to avoid the destruction of relevant materials when litigation is "reasonably foreseeable." *Silvestri*, 271 F.3d at 590; *see also Thompson*, 219 F.R.D. at 100.[31]

---

**30.** In this case, Rambus has not shown how it might have been exposed to litigation that would have called for production of documents other than the patent litigation which it was itself formulating in 1998, 1999, and 2000. In the FTC litigation, however, Rambus cited testimony by Karp that he had a general apprehension about being drawn into some unidentified antitrust litigation involving Intel Corporation. Infineon's April 6 Brief, Ex. 10.

**31.** Rambus submits, without decisional support, that, before a court can find spoliation, it must find that the alleged spoliator reasonably antici-pated litigation with the specific party who later alleges the spoliation. Although the spoliation decisions tend to arise in the context of anticipated litigation with a potentially identified adversary, there is no decision that articulates the rule as Rambus presents it. Moreover, Rambus' argument is somewhat disingenuous given that, in 1998, 1999, and 2000, Rambus had identified a number of DRAM manufacturers, including Infineon, as the targets of Rambus' litigation. Hence, even if the rule were as Rambus contends, Rambus would fall within it.

### F. Analysis of the Spoliation Issue in Perspective of the Entire Record as Described Above

 The substantive legal principles which guide the assessment of Infineon's motion are set forth above in DISCUSSION Section I.A. As explained there, to pierce Rambus' claims of privilege, Infineon must make a prima facie showing that: (1) Rambus was engaged in or planning a scheme of spoliation and sought or used the advice of counsel or the input of work product to further the scheme; and (2) that the documents containing the privileged communications or work product bear a close relationship to Rambus' scheme to engage in spoliation. *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir.1999). For the reasons set forth below, Infineon has satisfied its burden.

First, as recounted above, there is already a binding holding that Rambus knowingly and intentionally destroyed documents relevant to this case at a time that it reasonably anticipated patent litigation with specifically identified DRAM manufacturers, including Infineon. *Rambus, Inc.*, 155 F.Supp.2d at 680–83.

> [T]he record in this case shows that Rambus implemented a "document retention policy," in part, for the purpose of getting rid of documents that might be harmful in litigation. Rambus instituted its document retention policy in 1998. Clearly, *Rambus contemplated that it might be bringing patent infringement suits during this timeframe* if its licensing efforts were not successful—its Business Plan unequivocally states that the issuance of JEDEC-related patents would put it in a position to demand royalties from semiconductor manufacturers. Rambus executive Allen Roberts testified that one of the reasons for the document destruction was that the documents might be discoverable in future litigation, although he also stated that the policy was just a "house-keeping thing."

*Id.* (emphasis added). And, because that finding was not appealed, it has become the law of the case.

Second, the FTC has held that " '[c]ertainly by the time Rambus chose to commence its document retention program in 1998, it knew or reasonably could anticipate [D]RAM-related litigation.' " *Rambus, Inc.*, 220 F.R.D. at 286 (quoting decision of the FTC administrative law judge). On the basis of that finding, the administrative law judge imposed sanctions against Rambus. *Id.*

Third, the record to date shows that Rambus adopted its document retention program because it anticipated litigation with DRAM manufacturers over its patents and that the document retention program was an integral part of the company's patent litigation strategy which, in turn, was an integrated component of the company's business plan. The company conceived and implemented the document retention program in 1998, continued the program through 1999, and even continued it in 2000 while discovery was underway in this case. The record shows that the document destruction was on an enormous scale reaching all kinds of documents with potential relevance to this case and that it was voluminous, sweeping up and purging millions of documents under the control of Rambus, both in its own facilities and in the offices of its retained outside patent counsel.

The record shows that, in 1998, 1999, and 2000, Rambus actually had identified the DRAM manufacturers with whom it planned to engage in litigation and had even devised a sophisticated system to rate its litigation targets. In like fashion, and at the same time, Rambus chose the venues in which to litigate with its preselected litigation adversaries. And, all of that was accomplished as part of the same ongoing litigation strategy of which its document retention program was an integral part. Moreover, all of that took place while the document retention program was in operation.

Fourth, the record establishes that the document retention program was conceived and implemented with the advice and assistance of counsel, first Cooley Godward and later Steinberg. Until Steinberg took over the position, the company's Vice President of Intellectual Property, Karp, worked hand in glove with these lawyers to plan and implement the document retention program, as well as the patent licensing and litigation strategy of which it was a part.

Fifth, the allegedly privileged documents bear a close relationship to the spoliation scheme. Many documents [32] specifically link the advice about adopting, and the implementation of, the document retention program with the company's patent licensing and litigation strategy. Others that, in 1998, 1999, and 2000, no longer mention document retention, show the continuation of the same licensing and litigation strategy while the same document retention program continued to be implemented unabated or altered.[33] It is unclear exactly when Rambus expected to commence the patent infringement litigation, in which, in 1998, it was planning to engage with DRAM manufacturers. By August 27, 1998, a preliminary infringement study for a DRAM product had been completed, the manufacturer of which was identified as a potential litigation adversary earlier in 1998. The text of some of the 1998 documents permit the inference that, in 1998, the company contemplated the commencement of litigation in 1999. Later documents in 1998, however, show that, although the document retention component of the litigation strategy was moving to its initial operational stage by mid–1998 and was made operational in September 1998, the company was considering that litigation needed to be delayed until 2000. Nonetheless, the documents show that, through 1999, Rambus anticipated initiating, as soon as its patent portfolio permitted, patent litigation against specifically identified DRAM manufacturers, including Infineon, in specifically identified venues, including this one. All the while throughout 1999 and into 2000, Rambus was continuing to destroy documents.

Thus, even though a number of documents dated in 1999 and 2000 do not actually mention the words "document retention program," the record to date is that the program was a key part of the company's patent litigation strategy from the time that it was implemented until after the initiation of this action. On this record, it is clear that the document retention policy is not susceptible of separation from the overall patent litigation strategy. And, the patent litigation strategy is, in turn, an integral part of the company's patent licensing strategy. In fact, the strategy is often termed "licensing/litigation" or "licensing and litigation" strategy. Finally, the licensing/litigation strategy is a component of the company's intellectual property plans. On this record, the 1998, 1999, and 2000 patent licensing and litigation documents, as herein identified, that do not mention the words "document retention program," nonetheless bear a close relationship to the legal advice from Cooley Godward in 1998 and from Steinberg in 1998 and thereafter in 1999 and 2000.

The destroyed documents appear to have included many of the kinds of documents usually generated in the course of business that contain information that is useful in ascertaining truth and in testing the validity of positions taken in litigation, *e.g.*, email communications, notes of license negotiations, contract drafts, as well as information about activities at JEDEC. So sweeping was the Rambus destruction that the destroyed documents may also include reverse engineering documents and claim charts and other infringement related documents.[34] Thus, even though the record is incomplete about the kinds of documents that were destroyed, the record developed to date confirms the holding previously made that the destroyed documents were relevant to this case. *Rambus, Inc.*, 155 F.Supp.2d at 683. Further discovery will be necessary to flesh out the extent of the destruction and the effect of it on this case.[35]

---

**32.** Doc. Nos. 313, 315, 317, 319, 325, 326, 327, 371, 373, 374, 375, 376, 528, 1114, 1960, 2784, & 4077.

**33.** Doc. Nos. 268, 270, 271, 279, 358, 363, 364, 367, 644, & 2331.

**34.** Such documents, to which one would have expected Rambus to have claimed a privilege based on the other claims it has made in this litigation, are conspicuously absent from Rambus' various privilege logs.

**35.** At oral argument, counsel for Rambus, while addressing a document already disclosed to Infineon, advised that Rambus has not produced to Infineon the reverse engineering documents referred to in the document under discussion. The privilege log does not identify such documents and the *in camera* review did not reveal documents of that description. That, of course, prompts the question: were they destroyed?

In sum, the record to date shows that, from early 1998 through 2000, Rambus had in effect a document retention program that was conceived and implemented as an integral part of its licensing and litigation strategy. That strategy, including the document retention program portion thereof, was devised and implemented with the aid and advice of lawyers, both in-house and outside. The company's plan was to destroy discoverable documents as part of its litigation strategy and the allegedly privileged documents evince that plan. Other evidence shows that the document destruction plan continued to be implemented throughout 1999 and 2000 while the litigation strategy of which it was a constituent element was also in final preparation and implementation.

By any measure, on this record, Infineon has made a prima facie showing that Rambus intentionally has engaged in the spoliation of evidence and that the crime/fraud exception should operate to pierce Rambus' asserted privileges. *Chaudhry*, 174 F.3d at 403. Rambus' defense to this proof is that it established a legitimate document retention program for legitimate reasons. *Rambus, Inc.*, 220 F.R.D. at 285–86. That defense simply does not square with the record as it currently stands. There is nothing legitimate about devising and implementing a plan to destroy documents as a core part of a patent licensing and litigation strategy. No decision cited by Rambus so holds. And, the Court's independent research has uncovered no authority to that effect.

Where, as here, Rambus intended to engage in a specified kind of litigation, with specified, carefully selected litigation targets in specified venues and, as part of its plan to do so, set about to destroy documents relevant to those litigations, the courts cannot sanction a document retention program as legitimate. Here, the program was set up for what, on the record to date, rather clearly appears to have been an impermissible purpose—the destruction of relevant, discoverable documents at a time when Rambus anticipated initiating litigation to enforce its patent rights against already identified adversaries. Indeed, that purpose runs contrary to the rule that there is a duty not to destroy documents when litigation to which they are relevant is anticipated. *Silvestri*, 271 F.3d at 591.

Simply put, destruction of documents of evidentiary value under those circumstances is wrongful and is fundamentally at odds with the administration of justice. Such activities are not worthy of protection by privileges that are designed to advance the interests of justice because those activities run contrary to the interest of justice and, in fact, they frustrate the fair adjudication of controversies by depriving the finder of fact of evidence from which the truth may be discerned. Courts simply cannot sanction the destruction of relevant evidence when litigation reasonably is, or should be, anticipated. Nor can courts allow cherished and important privileges to be diminished by permitting their use to conceal document destruction as practiced by Rambus.

Document retention programs, lawfully implemented, are certainly permissible. But, even lawful programs must be suspended or adjusted when litigation is reasonably anticipated and the in-place program runs the risk of destroying potentially relevant materials. As the record now stands, Rambus' conduct here defies that precept in that Rambus actually started a program because it anticipated that it would soon begin litigation. The fact that the litigation commencement date was deferred by Rambus does not alter that fact. Instead, it permits the inference that Rambus deliberately destroyed documents while it improved (in its view) its litigation posture and while it refined its litigation strategy and slightly altered its litigation targets. Research has disclosed no precedent for finding that such conduct is legitimate or that document destruction under those circumstances can be clothed with propriety merely by calling it a "document retention program."

## CONCLUSION

For the foregoing reasons, Infineon's Motion to Compel Production of Documents and Testimony Relating to Rambus's Document Retention, Collection And Production (Docket No. 492) is granted. Rambus will be required to produce the following numbered

documents (as numbered in the privilege list dated January 29, 2004): Document Nos. 268, 270, 271, 279, 313, 315, 317, 319, 325, 326, 327, 358, 363, 364, 367, 371, 373, 374, 375, 376, 528, 644, 1114, 1960, 2331, 2784, and 4077. Also, Rambus shall be required to produce all other documents from January 1, 1998 through December 31, 2001 that: (1) disclose or discuss the conception and implementation of its document retention program; (2) disclose or discuss the relationship between the document retention program and Rambus' patent licensing and litigation strategy; (3) disclose or discuss the kinds and number of documents destroyed after the document retention program was instituted; (4) disclose or discuss Rambus' collection and production of documents in this action. Further, Infineon shall be permitted to take depositions on the foregoing subjects.

The authorities addressed to the issue of spoliation generally involve requests for sanctions or remedial measures, such sanctions ranging from so-called "adverse spoliation inferences" to outright dismissal of the complaint. *See generally,* Charles R. Nesson, *Incentives to Spoliate Evidence in Civil Litigation: The Need for Vigorous Judicial Action,* 13 Cardozo L.Rev. 793 (1991). Whether and what sanctions or remedies are appropriate depends upon a variety of factors which are discussed in the authorities cited herein. The factors include, without limitation, the spoliator's state of mind, bad faith, the kinds of documents destroyed, and the consequences of the destruction to the adversary's case. Thus, Infineon shall also be entitled to conduct discovery addressed to the subject of appropriate sanctions.

To assure that the intrusion into Rambus' patent licensing and litigation strategy is properly circumscribed to the facts, privileged or otherwise, about the company's anticipation of litigation from January 1, 1998 until the filing of this action on August 8, 2000, and to the destruction of documents under the document retention plan from January 1, 1998 through the end of discovery in this action in April 2001, Infineon shall submit a plan of discovery for review and approval by the Court. Further to assure that the depositions are properly circumscribed as

herein indicated, the Court will be available to supervise or, if necessary, preside over depositions either directly or through a Magistrate Judge.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.